# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

MCKINLEY (MACK) DUNCAN,    )
    )
        Plaintiff    )
    )
   vs.    )    CASE NO. CV00-HGD-1194-S
    )
SUPERIOR CEDAR HILL LANDFILL    )
INC., et al.,    )
    )
       Defendants    )

**ENTERED**
FEB 2 8 2002

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment

filed by defendant, Superior Cedar Hill Landfill, Inc., previously known as Urban Sanitation

Corporation (Superior) [Doc. #21].[1] Defendant has filed evidence [Doc. #24] and a brief [Doc.

#25] in support of the motion. Plaintiff has filed evidence [Doc. #28] and a brief [Doc. #29]

in opposition thereto. Defendant has filed a reply to plaintiff's opposition to its motion for

summary judgment [Doc. #32]. This matter is before the undersigned United States Magistrate

Judge based on the consent of the parties pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

---

[1] While plaintiff named both Urban Sanitation Corporation and Superior Cedar Hill Landfill, Inc., as
defendants in his complaint, these defendants are in actuality the same entity and will be referred to as "defendant"
in this Memorandum Opinion.

## FACTUAL BACKGROUND

Plaintiff, McKinley (Mack) Duncan, an African-American male, began working for defendant in January 1997. He was hired as a general laborer, and his primary job was to pick up paper on the landfill site. Plaintiff was the only permanent black employee at the landfill. [Rogala Deposition. at 45-46]. At the time he was hired, plaintiff received a copy of the employee handbook which outlines the course of action to take in the case of harassment or discrimination. Duncan acknowledges that the handbook directs that, if an employee has a complaint about not being treated fairly, he may complain to a member of management. [Duncan Deposition. at 52; Decl. of Vernon Smith at Exh. C]. According to Duncan, the employee handbook states that, in the event an employee violates the company's anti-discrimination policy, the employee is first given written notice of the violation; the second time garners a warning; and the third violation results in termination. [Duncan Deposition. at 52-53].

Duncan alleges that when he first went to work for Superior, he occasionally was allowed to learn other jobs on the site, such as running a compactor, driving the mud truck, and working in the machine shop. [Rogala Deposition. at 59; Duncan Deposition. at 20-21]. Jamie Isbell, an equipment operator for Superior, worked with plaintiff on Saturdays and would, from time to time, ask plaintiff to run the compactor or bulldozer. [Decl. of Jamie Isbell at ¶ 3]. However, Superior asserts that it was not the usual practice for Superior to allow laborers to do other jobs, except on an as-needed basis. [Decl. of Vernon Smith at ¶ 12].

Plaintiff asserts that shortly after he began to work at the landfill, his immediate supervisor, David Ginn, used racial epithets in his presence and in the presence of other

2

employees.  He also states that during this time, Ginn took him to his vehicle, showed him a pistol with a scope on it, and told him he could shoot someone off the hills of the nearby landfill.  Duncan considered this to be intimidating because he was the only one who ever worked on the hill.  [Duncan Deposition. at 22].

Sue Rogala, an employee of the landfill since 1973, was the landfill manager in February 1997.  In February 1997, a verbal report came to Rogala's attention through another landfill employee and Duncan that Duncan was being harassed by Ginn, who was calling Duncan racial slurs, including the "N" word (nigger).  [Duncan Deposition. at 108; Rogala Deposition. at 9-11, 52-53,  68-69].  She assured Duncan that this would not happen again.

As a result, Rogala spoke to Ginn, who admitted using the slur and ridiculing Duncan because he was fat.  She told Ginn that he would have to be written up for what he said.  She further told him that, if it happened again, she would have to tell her supervisor, Area Manager Vernon Smith, but that "we would try to solve it between the three of us."  [Rogala Deposition. at 13].  Ginn responded that he would go to Duncan and apologize and that it would not happen anymore.  Rogala advised Ginn that if he used racial slurs against Duncan again, he could possibly be fired.  [*Id.*].  Duncan admits that Ginn apologized for his actions and promised that it would not happen again.  [Duncan Deposition. at 48-49].

Rogala stated that she thought she had written up Ginn but could not remember.  She testified that, if she had written up Ginn, there would be documentation.  [Rogala Deposition. at 13-14].  Neither party has provided evidence of any written reprimand of Ginn for this incident.  Furthermore, although she had worked at the landfill since 1973, Rogala testified that

3

she was unaware of any written policies in effect at the landfill regarding the conduct of employees. [*Id.* at 25-28].

In addition, Rogala called a meeting of all employees on February 18, 1997, and told all present that day that "there had been a complaint about name calling, and that I wouldn't tolerate people being disrespectful to one another, and if it continued, I would call Vernon." [*Id.* at 79]. Thereafter, for about two weeks, Rogala periodically asked Duncan the status of his relationship with Ginn. She also asked Ginn about the situation. After being told for two weeks that things were improving, she quit asking. [*Id.* at 15, 79-80].

According to Rogala, after about three weeks, Duncan came to her and told her that David Ginn was again calling him the "N" word and fat and that he felt Rogala had done all she could, but it had not helped. [*Id.* at 15, 36, 52-53]. Rogala states that she told both Ginn and Duncan that this problem was above her and would be turned over to her supervisor, Vernon Smith. [*Id.* at 15, 35-36].

Rogala testified that she became aware of Duncan's claim that Ginn displayed a pistol and made intimidating remarks to him when she read Duncan's complaint to the EEOC. [*Id.* at 31]. However, she did nothing to investigate the allegation because she learned of it after Duncan's second complaint regarding racial slurs and, thus, after she had turned the matter over to Vernon Smith. [*Id.* at 32]. She does not know how Smith handled this allegation. [*Id.* at 33]. However, she states that Ginn was neither terminated, suspended, nor deprived of any benefits or pay as a result. [*Id.* at 38]. This is corroborated by Vernon Smith. [Smith Deposition. at 40-41]. Ginn was given a verbal warning the second time. [Rogala Deposition. at 14-17].

4

However, the "warning" said nothing about using racial epithets and advised Ginn that "[i]f you find it necessary to discipline an employee for work performance, you are to refer to the companies [sic] employee handbook which outlines the progressive discipline policy." [*Id.* at 19-20].

Smith subsequently came to the landfill at Rogala's request. According to Rogala, she was present when Smith spoke to Duncan about the second incident. She asserts that Duncan told Smith that David was calling him the "N" word, that he had felt pressure on the job, and that he had come to Rogala, but it had not helped. [*Id.* at 36].

Vernon Smith was the general manager for Superior during the entire time that Duncan was employed at the landfill. [Smith Deposition. at 12]. Prior to June 1997, Smith's office was not located at the Urban Landfill, and he would visit the landfill only once or twice a week for a few minutes. He usually met with Sue Rogala during those visits. [*Id.* at 13-14]. In June 1997, he moved to the Urban Landfill on a full-time basis. [*Id.* at 13].

Smith testified that during the first part of April 1997, Sue Rogala called him and told him that she had a personnel issue and desperately needed to see him. [*Id.* at 16]. When he arrived, she told him about the February 1997 incident and what had subsequently transpired which, according to Smith, was that "David [Ginn] was cursing and all that on the landfill and McKinley had taken objection to it." She asked him to resolve the situation. [*Id.* at 17]. Smith directed Rogala to have Duncan come to the office. Duncan came to the office and "related to me some of the things that happened." [*Id.*]. Smith asserts that he told Duncan that Superior did not condone "that type of action" and that no employee should be forced to work

"in those sort of conditions or talked to in that way." [*Id.*]. He states that he told Duncan he would look into it and get the issue resolved. [*Id.*].

According to Smith, a letter of reprimand was given to Ginn, but no other punishment was imposed. [*Id.* at 33, 40-41; Decl. of Vernon Smith at Exh. B]. Smith explained that the letter did not reference Duncan or racial epithets because he believed that problem had been resolved in February and had not repeated itself. [Smith Deposition. at 37]. He testified that the issue that arose in April revolved around Ginn's cursing at the landfill. Instead of asking someone to do something, he spoke to them in a demeaning and derogatory manner. According to Smith, this problem was experienced by all the landfill employees, not just Duncan. [*Id.*]. Contrary to the testimony of Sue Rogala, he denied that Duncan told him about Ginn using any racial epithets and disagreed with Rogala's testimony that Duncan had done so. [*Id.* at 52-54]. However, he acknowledges that his response to the EEOC complaint states he talked with Duncan, who said Ginn had called him a "coon daddy," but did not recall Duncan using the word "nigger." [*Id.* at 54; Decl. of Vernon Smith at Exh. D].

Smith testified that he did not learn about the pistol incident until he received the EEOC complaint. [Smith Deposition. at 23, 42]. Since he learned of the incident long after the fact and because the general counsel for Superior was preparing a response to this and Duncan's other claims, he did not investigate it further. [*Id.* at 42]. Likewise, he only learned about Ginn's comments to Duncan and Stephen Crim (about a black and a white riding to work together) at the time he received the EEOC complaint. [*Id.* at 43].

Plaintiff testified that for approximately the first two months that he worked at the landfill, David Ginn was not disrespectful toward him. [Duncan Deposition. at 25-26]. However, in February 1997, Ginn referred to Duncan as a "nappy-headed fat ass." [*Id.* at 24, 35]. Duncan alleges that Ginn also began to make racist jokes and comments directed toward him. He asserts that, on one occasion, Ginn said, "A black man and a white man ride together, they must be f—ing the same woman," and then "What do you call them? You call them nigger-lovers." [*Id.* at 26-27].

Duncan states that this remark was directed towards himself and a white employee, Steven Crim, because they rode to work together. This was said in the presence of the whole crew. [*Id.* at 28]. Duncan states that, on another occasion, Ginn made the comment to Duncan that "[s]ince you and Steve ride together, y'all must be f—ing each other's wife." [*Id.* at 38]. Duncan asserts that he complained to Rogala about the  incident involving the display of Ginn's pistol to Duncan. [*Id.* at 36-37]. According to Duncan, once he began, Ginn made some sort of racial comment toward him every day. [*Id.* at 26]. He initially testified that he was unsure whether the "nappy-headed" comment came before or after his initial complaint to Rogala. [*Id.* at 36]. However, later in the same deposition, plaintiff states that the time of his first complaint, he did report the pistol incident along with the "nappy-headed" comment. [*Id.* at 46]. As noted above, Ginn apologized to plaintiff for these remarks. [*Id.* at 48-49]. Duncan concedes that after this incident, Sue Rogala asked him how things were going, and he told her they were "going all right." [*Id.* at 86, 96]. However, he further testified that, a couple of weeks later,

Ginn began harassing him again and that he again complained to Rogala.  According to Duncan, Ginn was the only employee who harassed him.  [*Id.* at 23].

Duncan initially testified that, though Ginn made other racial comments, only these two statements were made in the presence of others.  [*Id.* at 50].  He testified that, other than these three remarks, he could recall no other comments that were racial in nature.  [*Id.* at 51].  Later, however, he stated that Ginn would refer to plaintiff with the "N" word three out of every five working days, sometimes when the two of them were alone together and sometimes in front of other employees.  [*Id.* at 55-56, 94].  Later still, he states again that there were only two racial slurs or jokes told in the presence of other people.  [*Id.* at 81].

Counsel for Superior pointed out that, in plaintiff's EEOC complaint, he states that Ginn continued to use racial slurs and tell racial jokes around the rest of the work force.  [*Id.*].  When asked to explain this contradiction, Duncan affirmed that there were, in fact, other comments besides the two jokes, related above, made by Ginn in front of the other workers.  However, he testified, at that time, that he could not recall what these comments were although the "fat jokes" bothered him more than anything.  [*Id.* at 82-84].  Nevertheless, he later testified that Ginn repeatedly called him a "nappy-headed fat ass" and "nigger," often in front of other workers.  [*Id.* at 108].

Former employee Steven Crim stated in an EEOC discrimination complaint that he has observed several incidents where David Ginn made racial references and used racial slurs or told racist jokes both in and out of the presence of McKinley Duncan.  [Doc. #29 at Exh. 2, Charge of Discrimination by Steven Crim].  Former employee Roy Crim states that, while

8

working at the landfill, he heard David Ginn refer to McKinley Duncan, in Duncan's presence, as a "nigger" or use other racial slurs at least fifteen times. [Doc. #29 at Exh. 3, Declaration of Roy Crim]. On one occasion, he and Duncan were alone with Ginn when Ginn called Duncan a "nigger" and a "fat nigger." According to Crim, Duncan asked Ginn why he called him such names and Ginn then called Duncan a "pojo." When Duncan asked Ginn what a "pojo" was, he responded that it was "a nigger who jumped up and down on a stick." [Id.].

After complaining a second time, Duncan states that Rogala referred the matter to Vernon Smith, and he subsequently had a conversation with Smith regarding David Ginn. [Id. at 79, 114]. Duncan testified that, as best as he could recall, he spoke with Smith only once. [Id. at 86]. He initially testified that Smith told him that the company would not tolerate his being subjected to racial slurs. [Id. at 56]. Duncan also believed that he may have spoken to Smith specifically about the "racial stuff." [Id.]. However, he later stated that he could not specifically recall what he and Smith talked about, though he asserts that it was "practically the same thing me and Ms. Sue talked about." [Id. at 114-15].

Plaintiff also claims that he was the object of retaliation for complaining about Ginn's harassment of him. Specifically, he alleges that the opportunity for advancement previously extended, to work and learn other jobs at the landfill, was revoked by Ginn after he complained about his conduct. [Id. at 14-18, 50]. He also alleges that he began to be sent home early. [Id. at 13-15]. According to plaintiff, before he complained, Ginn offered him the opportunity to run the compactor and drive the mud truck. [Id. at 16-18]. He had also been allowed to work in the machine shop on several occasions, learning how to repair machines. [Id. at 19-21].

9

Sue Rogala states that Duncan had, in fact, complained to her about Ginn not allowing him to learn other jobs after he complained. [Rogala Deposition. at 59-60]. However, she does not recall his ever complaining about losing overtime opportunities or being sent home early. [*Id.* at 60]. She testified that this occurred after she turned the other matter over to Vernon Smith and that she, therefore, did nothing. [*Id.* at 61]. However, Rogala testified that Duncan ran the packer and assisted the mechanic on a few occasions when they were short of help. [*Id.* at 80]. She further testified that she had no knowledge of any other laborers who moved into other positions at the landfill. [*Id.*]. According to Rogala, after receiving Duncan's request to continue to be allowed to learn other jobs, she did nothing, nor does she recall reporting it to Smith. [*Id.* at 61-62]. By this time, she claims she was merely another employee with no supervisory authority. [*Id.* at 62].

However, Vernon Smith testified that Sue Rogala advised him after the April 7 meeting that Duncan wanted the opportunity to advance within the company. [Smith Deposition. at 54]. He states that Duncan also asked him for this opportunity. [Decl. of Vernon Smith]. He further states that, other than laborer, the only jobs at the landfill were equipment operator and mechanic. When Smith arrived at the landfill in June 1997, there was no need for any additional equipment operators or mechanics, and it did not make good business sense to underwrite the cost of teaching plaintiff other jobs when the need for these jobs was decreasing. [*Id.*].

Smith further asserted that he had recently learned that Jamie Isbell allowed Duncan to use a bulldozer and compactor on Saturdays when only the two of them were working. This

10

was done without the knowledge or approval of management.  According to Smith, laborers may be asked to do other work but only on an as-needed basis. [*Id.*].  With regard to plaintiff's claim that his hours were reduced, Smith asserts that Duncan's hours were never reduced. [*Id.*]. Copies of Duncan's time cards bear this out.  [*Id.* at Exh. B].

Plaintiff also claims that the termination of his employment by defendant was in retaliation for his complaint to the EEOC about discrimination.  [Duncan Deposition. at 57]. However, plaintiff admits that he was fired, along with four white co-workers, after they went on strike, an action Superior considered to be illegal.  [*Id.* at 58-59, 74-78].  When asked why he went out on strike, Duncan stated that "[a]nd there was nothing running right that day.  And everyone  just was ready to quit.  Just went down – – we went down to the office.  I think it was right at lunchtime, I am not for sure.  Everybody clocked out and said, 'Let's strike.'  That's all I remember of that."  [*Id.* at 74-75].  According to Duncan, Vernon Smith gave the strikers twenty minutes to get back on the premises or be terminated.  [*Id.* at 75].  He further admits that while he believes his firing was in retaliation for filing a discrimination complaint, he has no evidence to support it.  [*Id.* at 59].

Vernon Smith states that David Ginn was not involved in the decision to fire Duncan or his four white co-workers.  According to Smith, they were all fired on August 21, 1997, for walking off the job without permission.  [Decl. of Vernon Smith].  Because of a change in business conditions, Smith states he did not fill any of the positions left vacant by these terminations, including Duncan's.  [*Id.*].

Plaintiff filed this action on May 4, 2000, alleging causes of action for violation of Title VII, based on a racially hostile environment and retaliation, violation of 42 U.S.C. § 1981, based on a racially hostile environment, and intentional or reckless infliction of emotional distress.

## DISCUSSION

This matter is considered by the court pursuant to the provisions of Rule 56, Fed. R. Civ. P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

12

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

## Hostile Environment Claim

In order to prove a claim for a racially hostile work environment, a plaintiff must "demonstrate that the actions of the defendants altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

13

*Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted).

For racial slurs spoken in the workplace to constitute a hostile work environment, they must be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *Edwards*, 49 F.3d at 1521 (citing *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). In deciding whether a hostile environment was created, factors to consider include (1) the frequency of the discriminatory conduct, (2) the severity of the discriminatory conduct, (3) whether the conduct is threatening or humiliating, and (4) whether the conduct unreasonably interferes with the plaintiff's performance at work. *Id.* at 1521-22. *See also Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1982). A plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at him. *Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991). However, the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the terms, conditions or privileges of employment to a sufficiently significant degree to violate Title VII. It must be sufficiently severe so as to alter the conditions of employment and create an abusive working environment. *Henson*, 682 F.2d at 904.

Although contradictory in places, reviewing the evidence in the light most favorable to the plaintiff, there is evidence that David Ginn, plaintiff's immediate supervisor, subjected Duncan to an implied threat to shoot him, made him the subject of racial jokes and ridicule, and called him a "nigger" and a "nappy-headed fat ass" on a recurring basis, even after plaintiff made an attempt to obtain relief from his employer. Duncan testified that the verbal abuse

14

adversely affected his work environment, as evidenced by the fact that he complained about it to management on two occasions and ate lunch alone to avoid Ginn's abuse. [Duncan Deposition. at 12, 82].

Under these circumstances, the court concludes that a question of fact remains as to whether plaintiff's work environment was sufficiently permeated with racist comments so as to constitute a hostile work environment. Therefore, summary judgment is not appropriate on this basis.

However, even assuming that Duncan was subject to a racially hostile work environment, his employer's liability is not automatic. The extent of an employer's liability for discriminatory or harassing conduct by an employee depends, to a great degree, on the status of the employee within the company. For instance, when a non-supervisory employee harasses a co-employee, then, if the harassment is such that the employer knew or should have known that it was occurring, the employer is liable for the harassment unless it took prompt action to remedy the problem. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1368 (11th Cir. 1999). In other words, the employer is liable for employee-on-employee harassment only if it is negligent in discovering or failing to promptly remedy the problem when it comes to its attention. *Ellerth*, 524 U.S. at 758-59, 118 S.Ct. at 2267.

The rules are different if the harassing co-worker is also a supervisor. If the harasser is a supervisor but the harassment has not resulted in "tangible job action," then the employer may nevertheless be held liable if the harassment is sufficiently severe and pervasive to alter the terms

15

and conditions of employment, subject to an affirmative defense set out below.  *Ellerth,* 524 U.S. at 751, 118 S.Ct. at 2264.

In the case of supervisor-on-employee harassment, the defendant is entitled to assert the affirmative defense set forth in *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), which is available in hostile environment cases where the harassment has not resulted in a tangible job action.  To avoid vicarious liability in such cases, the employer must show that (1) it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and (2) the victim had "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2292-93.  On the other hand, if the supervisor's harassment has resulted in a tangible job action, the employer is vicariously liable for the supervisor's actions and no affirmative defense is available.  *Faragher*, *supra*.

Plaintiff contends that he was terminated from his employment in retaliation for having made a complaint regarding race discrimination with the EEOC against his employer.  If true, this would constitute a tangible job action so as to make the affirmative defense of *Ellerth* and *Faragher* unavailable to defendant.  Plaintiff also contends that his hours were cut and that he was no longer allowed to cross-train for other jobs at the landfill after he complained about Ginn's conduct.

A tangible job detriment encompasses such things as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant

16

change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. at 2268.  Defendant has produced

evidence that plaintiff was terminated along with four white co-employees for taking part in an

illegal work stoppage.  Plaintiff admits that this happened and also admits that he has no

evidence to support his contention that his termination was related to his filing of an EEOC

complaint nearly three months earlier.  Thus, his contention that he was terminated for filing an

EEOC complaint is mere speculation and insufficient to support a finding of employer liability.

*Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999).

Likewise, the records of plaintiff's time and attendance do not bear out his claim that

his hours were cut significantly after he complained about Ginn.  Plaintiff has made no attempt

to show that these records are fraudulent or inaccurate.  Therefore, this does not constitute a

tangible job detriment.

The same is true with regard to plaintiff's allegation that he was no longer allowed to

train on other equipment after he made his first complaint.  The evidence adduced reflects that

plaintiff ran the compactor and drove the mud truck on only very few occasions.  While he may

have worked more regularly in the machine shop, it appears that such work was merely

required on an as-needed basis.  There is no evidence that any laborer at the landfill had ever

been allowed to move up to an equipment operator's position and, in any case, no such

positions were available at the landfill.  To prove adverse employment action in a case under

Title VII's anti-discrimination clause, an employee must show a *serious and material* change in

the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view

of the significance and adversity of the employer's action is not controlling; the employment

action must be materially adverse as viewed by a reasonable person in the circumstances. *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001). Plaintiff's claim that he was deprived of an opportunity to move up to a more lucrative position is speculative and insufficient to constitute a tangible job detriment. *Id.* at 1245. The court concludes that plaintiff has failed to establish that he has suffered a tangible job detriment. Therefore, the *Ellerth* affirmative defense outlined above is available to defendant.

As set out above, it is undisputed that defendant had an anti-harassment policy in place at the time of the incidents made the basis of this action and that plaintiff was aware of it. Furthermore, he followed the policy requirements of complaining to someone in management about the harassment. Initially, he complained to Sue Rogala. She took steps to alleviate the situation. Rogala confronted Ginn, made him apologize and told him that, if it happened again, she would report it to Vernon Smith. When Duncan claimed it had happened again, she turned the matter over to Vernon Smith.

Smith also investigated the matter. He subsequently issued Ginn a letter of reprimand. This letter did not reference Ginn's use of racial epithets but did direct him to treat all employees fairly and to address them in a professional manner. [Decl. of Vernon Smith at Exh. A]. Smith asserts that, after this letter of reprimand was issued, he had not heard of any additional name-calling incidents prior to plaintiff's termination on August 21, 1997. However, in his complaint of discrimination to the EEOC, Duncan alleged on May 31, 1997, that the harassment was continuing, noting that even the supervisors (plural) above Ginn had been

unable to stop Ginn's harassment of plaintiff. [Doc. #29 at Exh. 1, Complaint of Discrimination by McKinley Duncan].

Viewing the evidence in the light most favorable to plaintiff, it appears that plaintiff has availed himself of the dictates of defendant's anti-discrimination policy.  On the other hand, there is some question as to whether defendant followed its own policy.  This would have been difficult for Sue Rogala to do since she was unaware that there was any such policy or procedures in existence.  Nevertheless, there is no question that, upon hearing of the problem, she took immediate steps to halt Ginn's misbehavior.  Furthermore, it was effective for a while and, also for a while, she checked back with Duncan to see if things were still going well between himself and Ginn.  After a reasonable period of time without further problems, she quit inquiring.

The test for determining whether an employer's response to harassment is adequate is whether the employer's remedial and preventative action is reasonably calculated to end the harassment.  The Eleventh Circuit has stated that, where effectiveness is not readily evidenced by a stoppage of the harassment, a court is to consider several factors, including the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the employer's response was proportional to the seriousness and frequency of the harassment.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (11th Cir. 1998).  In *Adler*, the court noted that responses that have been held to be reasonable often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings

to refrain from harassing conduct, reprimands, and warnings that future conduct could result in progressive discipline, including suspension and termination. *Id.* (citations omitted).

Using this as a guide, it might appear that the actions taken by Sue Rogala after the first report of harassment were reasonably calculated to end the harassment. Unfortunately, thereafter, the conduct was repeated. In addressing such a situation, the Eleventh Circuit has stated:

> The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective. Repeat conduct may show the unreasonableness of prior responses. On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable.

*Adler*, 144 F.3d at 676.

When the harassment of Duncan first came to Sue Rogala's attention, there is no evidence that she gave Ginn a written reprimand. However, she did give him an oral reprimand and warn him that future problems could be met with more serious discipline. She also checked on the situation from time to time for at least a couple of weeks to make sure the conduct was not continuing. This action was reasonably calculated to end the harassment.

Whether defendant's response to plaintiff's second report of harassment shortly thereafter was reasonable is, however, open to question. It is arguable as to whether the discipline imposed was more severe than that imposed the first time. Although Rogala's reprimand was oral, she did specifically address the alleged racial harassment, advised Ginn who

had made the complaint, and what he was alleged to have done.  While Ginn was given a written letter of reprimand by Smith after the second incident, it did not reference the specific conduct for which he was being disciplined, nor did it mention Duncan in any way. Furthermore, the letter fails to address the consequences of any future violations, and there is no evidence that Smith took any proactive steps to determine the extent of the problem or to assure that the discipline imposed the second time was effective.  Under these facts, the court finds that there exists a genuine issue of material fact as to whether the steps take by defendant after the second complaint of harassment were reasonably calculated to end the harassment. Therefore, summary judgment is inappropriate as to plaintiff's claimed violation of Title VII as outlined in Count I of his complaint.

Furthermore, failure to take reasonable steps  to prevent a barrage of racial epithets and threats can make an employer liable  under 42 U.S.C. § 1981. *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503 (11th Cir. 1989); *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985).  Both Title VII and 42 U.S.C. § 1981 have the same requirements of proof and the same analytical framework.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Therefore, summary judgment is inappropriate as to Count II, as well.


## Outrage Claim

As to plaintiff's claim of outrage, set forth in Count III of his complaint, the court notes as follows.  Under the tort of outrage, liability is imposed under Alabama law for "unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which

21

causes severe emotional distress." *American Road Service Co. v. Inmon*, 394 So.2d 361 (Ala. 1980).  However, this harassment must amount to conduct that was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." *Id.* at 365.  Plaintiff did not seek any medical treatment for emotional distress at any time during or after his employment with defendant.  Likewise, though a jury may find it to have been ineffective, the evidence clearly establishes that Sue Rogala and Vernon Smith made attempts to address plaintiff's complaints.  Therefore, there is no evidence that defendant engaged in outrageous conduct or condoned such action on the part of David Ginn.  Therefore, summary judgment in favor of defendant is appropriate as to Count III.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this _____28th_____ day of February, 2002.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE